**EASTERN SHORE NATURAL GAS COMPANY, a Delaware Corporation, Plaintiff Below, Appellant,**

v.

**The DELAWARE PUBLIC SERVICE COMMISSION, Defendant Below, Appellee.**

Supreme Court of Delaware.

Submitted: July 20, 1993.
Decided: Jan. 12, 1994.

William A. Denman, Schmittinger & Rodriguez, P.A., Dover, for appellant.

James McC. Geddes and Regina A. Iorii, Ashby & Geddes, Wilmington, for appellee.

Gregory A. Inskip of Potter, Anderson & Corroon and Peter F. Clark of Delmarva Power & Light Co., Wilmington, for Delmarva Power & Light Co., amicus curiae.

Before VEASEY, C.J., HORSEY and WALSH, JJ.

HORSEY, Justice:

This appeal from Superior Court presents two questions: (1) whether a gas transporter, Eastern Shore Natural Gas Company ("ESNG"), is a public utility under 26 *Del.C.* § 102(2), subject to regulatory supervision by the Delaware Public Service Commission ("Commission"); and (2) whether the Commission's proposed rate regulation of ESNG's direct end use sales within the State of Delaware is preempted by the Natural Gas Act, 15 *U.S.C.*, ch. 15B, and the regulations of the Federal Energy Regulatory Commission ("FERC"). ESNG asserts that it is not a public utility within the meaning of the Delaware statute and that the Commission has intruded upon "the domain of exclusive federal regulation in the Commission's assertion of jurisdiction over ESNG's provision of natural gas service to eleven Delaware direct sale customers." We affirm the Superior Court's rulings adverse to ESNG on both issues as correct as a matter of law and affirm the judgment below in favor of the Commission.

## I. FACTS [1]

ESNG was incorporated in Delaware in 1955, as a wholly-owned subsidiary of Chesapeake Utilities Corporation ("Chesapeake"), also a Delaware corporation. In 1957 ESNG applied to the Federal Power Commission ("FPC"), FERC's predecessor, for a Certificate of Public Convenience and Necessity ("CPCN") to construct and operate an interstate natural gas pipeline to serve the Delmarva Peninsula, which at the time had no natural gas service. The pipeline would extend from Parkesburg, Pennsylvania (the source of the gas) to Salisbury, Maryland.

---

1. Because we fully agree with the Superior Court's result, we borrow liberally from, and generally adopt, the court's language and reasoning in its disposition of the case. Additionally, since the issues on appeal solely concern questions of law, rather than fact, we borrow liberally from the facts in the unreported opinion of the Superior Court, *Eastern Shore Natural Gas Company v. Delaware Public Service Commission*, 635 A.2d 1273 (1993).

The availability of natural gas would benefit communities within the Peninsula and stimulate industrial development. ESNG's application to the FPC to construct and operate an interstate pipeline was originally confined to serving a limited number of sales-for-resale customers and one direct sale customer within the Delmarva Peninsula. FPC rejected ESNG's original application on the ground that the proposal was not economically viable.

To justify the pipeline's viability, ESNG sought out and found a select group of high-volume industrial consumers who were not natural gas customers and whose special needs could not be met by the existing facilities of the local distribution company. ESNG obtained three such direct sale customers in Delaware: Tidewater Oil in New Castle County; International Latex Corporation in Kent County; and the Seaford Municipal Power Plant in Sussex County. ESNG then amended its FPC application to include these customers. On November 29, 1957, the FPC granted a CPCN authorizing ESNG to construct and operate a 124–mile interstate pipeline extending from Parkesburg to Salisbury. ESNG commenced its pipeline operation in 1959.

██ Between 1959 and 1965, ESNG entered into individual contractual agreements to service several high-volume industrial direct-sale customers. In each case, ESNG received authorization from the FPC or its successor, the FERC, prior to providing natural gas service; however, FERC did not regulate the prices charged by ESNG to its direct-sale customers.[2]

By the time this action was filed, ESNG was providing natural gas service to thirteen direct-sales customers, eleven located in Delaware and two in Maryland. Seven of ESNG's eleven Delaware customers are located in Chesapeake's retail service territory and four are located within Delmarva Power & Light Company's ("Delmarva") retail service territory. While ESNG has not accepted any new direct-sale customers since 1965, it does not purport to limit itself to the direct-sale customers it currently serves.

## II. PROCEEDINGS BELOW

In August 1990, Formosa Plastics Corporation ("Formosa"), one of ESNG's four direct-sales customers within New Castle County and within Delmarva's retail sales territory, filed a complaint with the Commission against Chesapeake, ESNG and Delmarva. Formosa asserted that it was unable to arrange transportation of natural gas it had purchased from Texas to its manufacturing plant in New Castle County. Formosa's natural gas requirements had been supplied by Chesapeake and ESNG, pursuant to a 1964 Stipulation and Settlement of territorial disputes entered into between Delmarva and Chesapeake and approved by the Commission. Formosa's primary complaint was that ESNG's service obligations to Formosa were inadequate to meet Formosa's natural gas requirements because of ESNG's refusal to provide transportation services.[3] Formosa alleged that Chesapeake claimed that ESNG

2. Since its inception, ESNG has been regulated by the FPC and its successor, the FERC, pursuant to the Natural Gas Act. Under the Act, the federal government has exclusive jurisdiction over: (1) the sale for resale of natural gas in interstate commerce; (2) transportation of natural gas in interstate commerce; and (3) any natural gas company involved in the transportation or sales of natural gas. Federal regulation requires ESNG to seek approval from FERC for any modifications or additions to its service obligations.

3. Prior to filing the complaint, Formosa investigated the possibility of supplanting ESNG's gas service with that of Delmarva due to ESNG's refusal to provide transportation services. However, Delmarva was reluctant to provide services to Formosa due to the restrictions imposed by

the 1964 Stipulation. The 1964 Stipulation provided, in pertinent part:

Eastern Shore Natural Gas Company may continue to serve the two customers it now serves north of said dividing line, to wit: Tidewater Oil Company and Stauffer Chemical Company [Formosa's predecessor], so long as it can continue to fulfill the natural gas requirements of said two customers, and any other enterprise in which either of them have a financial interest which may be now or hereafter located on or contiguous to the present sites now owned by said two customers in New Castle County, but it will not add or serve any additional customers north of said dividing line unless required to do so by any Federal Regulatory Agency having jurisdiction.

could not transport the gas to Formosa through its system because ESNG was not, and had no definite plans to become, an open access carrier. Formosa further contended that it had been stymied in its efforts to secure transportation service from Delmarva, which refused to negotiate with Formosa because of the existence of the 1964 Settlement Agreement.

Following the commencement of the Commission's proceedings, the parties entered into settlement negotiations and reached an agreement dated June 3, 1991, under which ESNG agreed to satisfy Formosa's requirements effective May 1, 1991. The respondents then sought dismissal of Formosa's complaint. The Commission's staff objected, requesting the Commission to direct ESNG to: (1) show cause why ESNG should not be compelled to apply for a CPCN; (2) file tariffs with the Commission setting forth the terms and conditions under which ESNG would thereafter, as a public utility, provide gas service in Delaware; and (3) file with the Commission all contracts under which it was currently providing service to end users of natural gas.

Chesapeake opposed the staff's request, contending that the Commission lacked jurisdiction over ESNG as a public utility under 26 *Del.C.* §§ 101, et seq. Following an investigation and further proceedings, the Commission found ESNG to be a "public utility" as defined in 26 *Del.C.* § 102(2); and the Commission concluded that it did have jurisdiction to regulate ESNG's "direct end use" rates for gas sales to its eleven direct-sale customers in Delaware. *In re Eastern Shore Natural Gas Company,* PSC Docket No. 92–2, Order No. 3372 (Feb. 11, 1992). However, the Commission stopped short of determining that it should exercise its jurisdiction to regulate ESNG's direct retail sales rates for its existing direct-sale customers. The Commission ruled that the "status quo will, for the time being, be permitted to continue," reasoning that ESNG's existing contracts for a direct sale service were "the product of extensive and presumably hard bargaining by sophisticated customers." While the Commission found it not necessary to review ESNG's executed contracts, it ordered ESNG not to take on new direct sale customers or materially alter sales or service to existing customers without Commission authorization, except to the extent permitted by the FERC.

ESNG filed a Notice of Appeal in Superior Court on February 19, 1992, and moved to stay the implementation of the Commission's decision. The motion was unopposed and granted on March 20, 1992. On April 15, 1992, Delmarva moved for leave to file a brief as *amicus curiae,* which was granted.

Following briefing and oral argument, Superior Court, on February 19, 1993, issued an opinion and order affirming the Commission's determination that ESNG was a public utility for purposes of the Commission's exercise of its jurisdiction over ESNG. On the issue of federal preemption, Superior Court affirmed the Commission's finding that its jurisdiction extended to the regulation of rates charged by ESNG to its direct sale customers. *Eastern Shore Natural Gas Co. v. The Delaware Public Service Comm'n,* Del.Super., C.A. No. 92A–02–002, 1993 WL 81309, Ridgely, P.J. (Feb. 19, 1993) (Opinion), slip op. at 19. ESNG then docketed this appeal.

### III. ISSUES ON APPEAL

Two issues are raised on appeal: (1) whether ESNG is a "public utility" within the meaning of 26 *Del.C.* § 102(2) of the Public Utilities Act of 1974, and therefore subject to the Commission's jurisdiction; and (2) whether, under the Natural Gas Act, 15 *U.S.C.,* ch. 15B, and FERC regulations, the Commission is preempted from regulating the rates charged by ESNG to its direct-sale customers.

#### *Parties' Contentions*

ESNG contends that both the Commission and the Superior Court erred when they found ESNG to be a public utility under the Act. ESNG argues that the mere selling of natural gas is not sufficient to render a company a "public utility" under Delaware law unless it is in the business of rendering service to "an indefinite public which has a legal right to receive its services or commodities."

ESNG contends that since it has only eleven direct-sale customers and has not added any since 1965, its direct sales have had no adverse impact upon any regulated public utility or natural gas customer in Delaware. Therefore, ESNG argues, it cannot, as a matter of law, be found to be a public utility under the Act. Alternatively, ESNG argues that, while the Natural Gas Act does not preempt Delaware from regulating the *price* it charges for its direct sales service, states are preempted from regulating any of the transportation services provided by ESNG as a transporter in interstate commerce. Arguing that FERC has exclusive control over ESNG's provision of *transportation* service to any customer, ESNG asserts that Delaware and its Commission can, at most, only regulate that portion of the price charged to direct sales customers that is "attributable to the sales service" provided by ESNG. The Commission's purported regulation of price is overbroad, ESNG concludes, because the "Order purports to regulate matters other than [ESNG's] direct sales rates."

The Commission takes a contrary position on both issues, while Delmarva, as *amicus,* limits its argument to sustaining the court's finding that ESNG is a public utility, subject to regulation by the Commission. The Commission and Delmarva argue that the term "public utility" is not solely dependent on whether a company holds itself out to provide service to an indefinite number of people or to all who request those services. Rather, such a determination "must be made on a case-by-case basis," taking into consideration both the company's relationship with its customers, and how the company's activities affect the public interest. The Commission further argues that, while it is preempted by the Natural Gas Act from regulating many of ESNG's activities, it is clearly not preempted from regulating rates for retail sales to end user customers. Since, by its order, the Commission stopped short of taking any action to interfere with or upset ESNG's existing contracts with its Delaware direct sale customers, the Commission argues that Superior Court cannot be found to have erred in declining to modify the Commission's order.

## IV. STANDARD OF REVIEW

 This Court's standard of review "mirrors that of the Superior Court." *Stoltz Management Co., Inc. v. Consumer Affairs Bd.,* Del.Supr., 616 A.2d 1205, 1208 (1992). When the issue is one of agency interpretation of statutory law, and application of that law to undisputed facts, this Court's review of the agency's decision is plenary, and it is not bound by the agency's conclusion. *Id.* This Court will give substantial weight to the Commission's interpretation of a statute it is empowered to enforce, provided that construction is not clearly erroneous. *Nationwide Mutual Insurance Co. v. Krongold,* Del. Supr., 318 A.2d 606, 609 (1974); *Vassallo v. Haber Electric Co.,* Del.Super., 435 A.2d 1046, 1050 (1981). Thus, this Court will not reverse the Commission's decision unless we find that the Commission's interpretation of 26 *Del.C.* § 102(2) is clearly erroneous. Because we find no error of law and that there is substantial evidence to support the Commission's finding below, we affirm the decision of the Superior Court affirming the rulings and findings of the Delaware Public Service Commission.

## V. DEFINING "PUBLIC UTILITY" UNDER THE ACT

### *The Public Interest Standard*

In determining whether ESNG is a public utility under the Act, and thus subject to the Commission's regulatory jurisdiction, the Court must focus on the definition of that term in the Public Utilities Act of 1974. A "public utility" is defined in Section 102(2) of Title 26 of the Delaware Code:

> "Public utility" includes every individual, partnership, association, corporation, joint stock company, agency or department of the State or any association of individuals engaged in the prosecution in common of a productive enterprise (commonly called "cooperative"), ... that now operates or hereafter may operate, within this State, ... natural gas ... *for public use.*

26 *Del.C.* § 102(2) (emphasis added). The Commission and ESNG agree that the pivot-

al question is the meaning of the phrase "for public use" in the definition of a public utility.

■ Under federal law, the transporting and selling of natural gas for ultimate distribution to the public is "affected with a public interest" and therefore, may be subject to regulation and control. 15 U.S.C. § 717(a).[4] In accordance with this statutory declaration, a majority of states have chosen to reject the "indiscriminate-service-to-an-indefinite-public" test, as advanced by ESNG, and instead choose to emphasize the public nature of a company's activities in relation to that public interest.

For example, in *Iowa State Commerce Comm'n v. Northern Natural Gas Co.*, Iowa Supr., 161 N.W.2d 111 (1968), the Supreme Court of Iowa, in rejecting a pipeline company's argument that it was not a public utility, aptly reaffirmed the language of *Indus. Gas Co. v. Public Utilities Comm'n*, Ohio Supr., 135 Ohio St. 408, 21 N.E.2d 166 (1939):

> [I]t is not a controlling factor that the corporation supplying service does not hold itself out to serve the public generally.... [A] business may be so far affected with a public interest that it is subject to regulation as to rates and charges even though the public does not have the right to demand and receive service.... [Thus] a corporation that serves such a substantial part of the public as to make its rates, charges and methods of operations a matter of public concern, welfare and interest subjects itself to regulation by the duly constituted governmental authority.

*Id.* 161 N.W.2d at 114.

Similarly, the Supreme Court of Minnesota held that status as a public utility did not hinge on a company's refusal to hold itself out indiscriminately to serve an indefinite public, but rather it depended on the particular facts in each case and on the public character of selling a traditionally regulated commodity. *Northern Natural Gas Co. v. Minnesota Public Service Comm'n*, Minn. Supr., 292 N.W.2d 759 (1980). In so holding, the Supreme Court of Minnesota specifically rejected Northern's argument that it was no longer adding direct-sales customers, noting that this was because of a Federal Power Commission prohibition, and that the gas company would probably solicit large volume customers if it could. *Id.* at 763.

In *In re Petition of South Jersey Gas Co.*, N.J.Supr., 116 N.J. 251, 561 A.2d 561 (1989), the Supreme Court of New Jersey affirmed the Board of Public Utilities' interpretation of the term "public utility" in a statute very much the same as Delaware's. The court found that "public utility" included a chemical company which sought to sell manufactured gas to a select group of large industrial customers. *Id.* 561 A.2d at 568–69. The Court focused on the public interest and the potential for destructive competition between unregulated companies and regulated utilities whose customers could be harmed by entry into the industry by the unregulated companies. *Id.* Delmarva makes this argument.

This concern for the interest of the consuming public was best stated in language quoted in *Southwest Gas Corp. v. Arizona Corp. Comm'n*, Ariz.App., 169 Ariz. 279, 818 P.2d 714 (1991):

> [T]he purposes of regulation are to preserve and promote those services which are indispensable to large segments of our population, and to prevent excessive and discriminatory rates and inferior service where the nature of the facilities used in providing the service and the disparity in the relative bargaining power of a utility ratepayer are such as to prevent the ratepayer from demanding a high level of service at a fair price without the assistance of governmental intervention on his behalf.

*Id.* 818 P.2d at 721, quoting *Petrolane–Arizona Gas Service Co. v. Arizona Corp. Comm'n*, Ariz.Supr., 119 Ariz. 257, 259, 580 P.2d 718, 720 (1978). The Arizona court further noted that when a company sells a product "affected with a public interest," the

---

4. Section 717(a) states in pertinent part:
 (a) ... [I]t is declared that the business of transporting and selling natural gas for ultimate distribution to the public *is affected with a public interest,* and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce *is necessary in the public interest.*
 15 U.S.C. § 717(a) (emphasis added).

company's right to be free from regulatory constraints is outweighed by the government's right to regulate that company's activities to protect the consuming public. *Id.,* quoting *Arizona Corp. Comm'n v. Nicholson,* Ariz.Supr., 108 Ariz. 317, 321, 497 P.2d 815, 819 (1972).

The Delaware Public Service Commission has expressed this concern for protecting the public interest when making the determination of public utility status. *Eastern Shore,* slip op. at 11. For example, in *In re Bayview Improvement Co.,* PSC Docket No. 288 (May 4, 1960), the Commission found that Bayview, by supplying water service to customers other than its own lessees and stockholders, was a public utility for purposes of the Commission's regulatory jurisdiction. The Commission noted that the Public Service Commission Act (predecessor of the Public Utilities Act) was remedial in nature, intended to restrict "unchecked competition between the utilities and to provide a redress for wrongs inflicted upon persons dependent upon a utility's services." *Eastern Shore,* slip op. at 11–12. Although the Commission was applying the "indiscriminate service to an indefinite public" test at the time, the Commission's liberal construction of the Act exhibited "an overall concern by the Commission of the need to protect the public interest." *Eastern Shore,* slip op. at 12; *see also In re First State Pipeline Co.,* PSC Docket No. 524, at 8 (Feb. 14, 1968) (stating that the Act's purpose was "to place under state regulation those businesses so affected with the public interest that the rates for and extent of their services could not be privately determined").

■ The Superior Court was not persuaded that "the 'public use' test, which requires indiscriminate service to an indefinite public, adequately addresses the need to protect the public interest from the potential adverse consequences caused by the unregulated sale of natural gas." *Eastern Shore,* slip op. at 13. Nor are we. The pivotal issue in the determination of a company's status as a public utility is whether the company's activities have a significant impact on the public interest the Commission was designed to protect. This requires an examination of the potential effects of the sale of natural gas by unregulated companies upon the public interest—regardless of the number or type of customers serviced.

ESNG argues that adoption of the "public interest" test "would authorize the Commission to regulate *any* company which engages in the sale of natural gas to others, regardless of whether the company sells to less than the general public." This argument presumes too much. The Commission is specifically empowered under the Public Utilities Act to grant or deny Certificates of Public Convenience and Necessity at its discretion in order to limit competition between utility companies.[5] 26 *Del.C.* § 203A(a)(1).

The Commission is empowered to "define or limit the territory or territories in this State within which the activities authorized by the Certificate may be conducted." 26 *Del.C.* § 203A(b)(3). The Legislature has also conferred on the Commission the discretion to refrain from normal supervision and regulation of public utility services, and to exercise such authority if deemed necessary to serve the public interest. 26 *Del.C.* § 201(c). As the Superior Court correctly points out in its opinion, the enactment of section 201(c), in conjunction with sections 203A(a)(1) and (b)(3), "indicates ... that the legislature specifically created the Commission for the purpose of balancing the interests of the consuming public with those of regulated companies and, accordingly, conferred broad discretionary power upon the Commission to certify or not certify a company for purposes of regulation." *Eastern Shore,* slip op. at 14; *see also Delmarva*

---

5. Section 203A(a)(1) states in pertinent part:
 Subject to the provisions of subsection (b) of this section and §§ 102, 201, and 202 of this title, no individual, copartnership, association, corporation, joint stock company, agency or department of the State, cooperative, or the lessees, trustees or receivers thereof, shall begin the business of a public utility nor shall any

public utility begin any extension of its business or operations without having first obtained from the Commission a certificate that the present or future public convenience and necessity requires or will require the operation of such business or extension.
 26 *Del.C.* § 203A(a)(1).

*Power & Light Co. v. City of Seaford,* Del. Supr., 575 A.2d 1089, 1097 (1990). The following statement by the Commission is particularly pertinent:

> It is impossible for the Public Service Commission to monitor and effectively control the extent of competition in the provision of traditionally regulated commodities if an unregulated firm with no obligation to serve all similarly situated customers and without a general obligation to provide service to all who require it in a specific territory can essentially enter the public utility business and "cherry pick" or "cream skim" away the existing utility's highest volume customers.
>
> * * * * * *
>
> The absence of such ability to regulate the extent of competition creates the potential for "destructive competition" with resulting adverse consequences for the existing utility and its customers.

*In re Eastern Shore Natural Gas Company,* PSC Docket No. 92–2, Order No. 3372, at 22–23 (Feb. 11, 1992). Delmarva so argues.

■ ESNG sells natural gas to eleven direct-sale end users; they are industrial companies that are independent concerns and not wholly-owned subsidiaries of ESNG. This being so, ESNG's activities are not exclusively private, and naturally affect the public interest. Although ESNG has not added any customers since 1965, it reserves the right to so petition in the future. Accompanying this possibility, is the possibility of adverse competition which may affect the public interest. These facts demonstrate "that the potential for adverse competition is substantial, and [ESNG's] activities with regard to the rates it charges its direct-sale customers should be regulated to prevent a potential breakdown of the rate structures of those utilities already under Commission jurisdiction." *Eastern Shore,* slip op. at 15.

We reject ESNG's argument that since its services are not available on demand to the general public, it is a private, not a public, company. To accept this argument would allow ESNG to avoid 26 *Del.C.* § 102(2) by simply stating it would not sell to certain customers, and therefore, avoid compliance

with the Act. *See In re South Jersey Gas Co.,* N.J.Super.A.D., 226 N.J.Super. 327, 544 A.2d 402, 408 (1988). Additionally, allowing the "public use" test would encourage other companies to enter the field by the device of entering into contracts with industrial direct-sale users on a one-to-one basis. This would defeat the regulatory scheme established by the Legislature under the Act and divert revenue that would have otherwise gone to the regulated utilities in the area to unregulated producers. *PW Ventures, Inc. v. Nichols,* Fla.Supr., 533 So.2d 281, 283 (1988). The diverted revenue would then have to be compensated for by the customers of the regulated utilities, whose fixed costs would not be reduced. *Id.*

■ For the foregoing reasons, this Court holds that regardless of whether a company sells to less than the general public, when a company engages in the sale of a regulated commodity to independent third parties, the company becomes a public utility, subject to the jurisdiction of the Delaware Public Service Commission under the Public Utilities Act of 1974 for the purposes of regulation.

### Commission's Past Failure to Assert Jurisdiction

■ The Commission's previous failure to assert jurisdiction is clearly relevant, but not conclusive or determinative of the Commission's authority over ESNG. A failure to do so is simply a fact to consider in light of the overall regulatory nature of ESNG's activities and their potential effects on the public interest. An agency is not forever bound by its prior determinations, but if an agency does depart from prior precedent, it "must either distinguish or rationally explain its departure." *City of Alma v. U.S.,* S.D.Ga., 744 F.Supp. 1546, 1562 (1990); *see also Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). This Court will uphold an agency's change of position if it reasonably explains how its new policy achieves the goals of the Act better than, or at the very least, as well as, the old policy. *City of Alma,* 744 F.Supp. at 1561 (citing *New York Council Ass'n of Civil Technicians v. Federal Labor*

*Relations Authority*, 2d Cir., 757 F.2d 502, 508 (1985)). Based on these considerations we find both reasonable and valid the Commission's explanation that "to fulfill its responsibility under 26 *Del.C.* § 202(c) [sic] permitting competition while protecting the public interest, the PSC must be in a position to prevent competition with public utilities where to do so would be in the public interest, as well as to promote and foster competition where the public would thereby benefit." *In re Eastern Shore Natural Gas Company*, PSC Docket No. 92–2, Order No. 3372, at 23 (Feb. 11, 1992).

## VI. FEDERAL PREEMPTION

■ We take up the remaining question: whether, as ESNG argues, Superior Court has erred in declining to find the Commission's order to effectively regulate ESNG's Delaware direct-sale activities in a preemptive manner. The Commission has acknowledged that it has the authority to regulate the retail rates which ESNG charges its Delaware customers, pursuant to 26 *Del.C.* § 201(a) and § 201(c) and 29 *Del.C.* ch. 104. However, the Commission concluded that it would preserve the status quo by limiting its current regulatory supervision of ESNG to "(1) accepting and considering complaints by customers and other utilities concerning ESNG's service; (2) requiring ESNG to file the annual and other periodic reports that are required of other regulated natural gas public utilities; and (3) requiring ESNG to pay the annual public utility assessment on gross intrastate operating revenues."

ESNG concedes that the Commission's authority extends to the regulation of direct sales rates. Nevertheless, ESNG argues that the Commission's order constitutes an attempt to regulate "matters other than [its] direct sales rates," which are activities subject to *exclusive* federal regulation by FERC, under the Natural Gas Act.[6] The Commission disagrees that its order is over-

broad so as to invade the province of the FERC. The Commission states that its exercise of jurisdiction over ESNG is properly limited to the regulating of the retail rates charged by ESNG to its direct-sale customers but that it has expressly left in place ESNG's present rate structure for all existing customers in Delaware.

It is clear that FERC has exclusive jurisdiction over many of ESNG's activities. The Commission recognized this when it stated that ESNG "may not take on new direct sale customers, nor ... materially alter sales or service to existing customers without this Commission's authorization *except to the extent permitted by Order of the Federal Energy Regulatory Commission.*" *In re Eastern Shore Natural Gas Company*, PSC Docket No. 92–2, Order No. 3372, at 27–28 (Feb. 11, 1992) (emphasis added).

The Court finds that the Commission has adequately acknowledged the limitations placed on its regulatory authority over ESNG by the Natural Gas Act and has not displaced any of ESNG's customers' direct sale rates. Hence, we find no merit to the claim that the Superior Court has erred in not finding the Commission's order to be overbroad.

## VII. CONCLUSION

In summary, we conclude: (1) that Eastern Shore Natural Gas Company is a public utility under the Public Utilities Act of 1974, Section 102(2), and subject to the Commission's jurisdiction; and (2) that the Commission's order is not invasive of federal jurisdiction since the Commission has recognized the limits imposed by the Natural Gas Act and FERC Regulations upon the Commission's exercise of its regulatory authority over ESNG.

\* \* \*

---

6. The Natural Gas Act states in pertinent part: (b) The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, *to the sale in interstate commerce of natural gas for resale* for ultimate public consumption for domestic, commercial industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, *but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.* 15 U.S.C. § 717(b) (emphasis added).

The decision of the Superior Court affirming the decision of the Delaware Public Service Commission is hereby affirmed.